Andrew J. Stein, Individually, as Trustee and On Behalf of Trust for Tenants' Rights, and On Behalf of All Others Similarly Situated, Respondents, v Rent Guidelines Board for the City of New York et al., Appellants, and Rent Stabilization Association of New York City, Inc., Intervenor-Appellant, et al., Defendant.

First Department, April 9, 1987

## APPEARANCES OF COUNSEL

*David Jaroslawicz* for respondents.

*Kristin M. Helmers* of counsel *(Leonard Koerner* and *Michael Barron* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for appellants.

## OPINION OF THE COURT

Ross, J.

At issue on this appeal is whether seven orders approved in 1980 and 1981 by the New York City Rent Guidelines Board (Board) were lawfully promulgated, pursuant to that Board's powers, under the New York City Rent Stabilization Law (RSL) *(see,* Administrative Code of City of New York § YY51-1.0 *et. seq.,* as added by Local Laws, 1969, No. 16 of City of New York, as amended; Emergency Tenant Protection Act of 1974 [L 1974, ch 576], as amended). The contested orders dealt with rent increases, fuel adjustment surcharges, vacancy increase allowances, and electrical inclusion adjustments.

Our research indicates that there is significant legal authority to indicate that, when it decided the permissible levels for rent increases, the Board was performing a quasi-legislative function *(Matter of Metropolitan Hotel Indus. Stabilization Assn. v New York City Rent Guidelines Bd.,* Sup Ct, NY County Mar. 27, 1985, Burton Sherman, J., Index No. 21444/1984, *affd* 111 AD2d 650 [1st Dept 1985]). Almost 40 years ago, the Court of Appeals, in *Wasservogel v Meyerowitz* (300 NY 125, 132 [1949]), held that setting "the maximum amount [of rent levels for residential tenants] is * * * a legislative act".

The New York City Council has stated that the purpose of enacting the RSL was to, *inter alia,* "prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering" (Administrative Code § YY51-1.0). Furthermore, by the terms of this statute, the responsibility for implementing the RSL's policy was given to "an agency of the city itself", which was the Board *(see,* Administrative Code §§ YY51-1.0, YY51-5.0 [a], [b]).

Subdivision (a) of section YY51-5.0 of the Administrative

Code dealt with the membership of the Board. The Mayor appointed all nine members, of whom two represented tenants, two represented property owners, and five represented the public. One of the public members was designated by the Mayor as the Board Chairman, and, each one of the public members, at the time of appointment, was required to "have had at least five years experience in either finance, economics or housing."

During 1980 and 1981, when the Board issued the orders in dispute, the applicable procedure, which the Board had to comply with in making rent adjustments, was contained in subdivision (b) of section YY51-5.0 of the Administrative Code, and read, in pertinent part, as follows: "The * * * board shall establish annually guidelines for rent adjustments, and in determining whether rents for housing accommodations * * * shall be adjusted shall consider, among other things (1) the economic condition of the residential real estate industry in the affected area including such factors as the prevailing and projected (i) real estate taxes and sewer and water rates, (ii) gross operating maintenance costs (including insurance rates, cost of fuel and labor costs), (iii) costs and availability of financing (including effective rates of interest), (iv) overall supply of housing accommodations and over-all *[sic]* vacancy rates, (2) relevant data from the current and projected cost of living indices for the affected area, (3) such other data as may be made available to it. Not later than July first of each year, the rent guidelines board shall file with the city clerk its findings for the preceding calendar year, and shall accompany such findings with a statement of the maximum rate or rates of rent adjustment, if any, for one or more classes of accommodations subject to this law, authorized for leases or other rental agreements commencing during the next succeeding twelve months. Such findings and statement shall be published in the city record."

Furthermore, during this same 1980-1981 period, subdivision (d) of section YY51-5.0 of the Administrative Code separately authorized the Board to determine the rental for apartments, which became vacant at the termination of a lease (note: this is the so-called vacancy increase allowance). In pertinent part, subdivision (d) reads, as follows: "Any housing accommodation covered by this law owned by a member in good standing of an association registered with the housing and development administration pursuant to section YY51-6.0 which becomes vacant for any reason, other than harassment

of the prior tenant, may be offered for rental at any price notwithstanding any guideline level established by the guideline board for renewal leases provided the offering price does not exceed the rental then authorized by the guideline board for such dwelling unit plus five per cent for a new lease not exceeding two years and a further five per cent for a new lease having a minimum term of three years, until July first, nineteen hundred seventy, at which time the * * * board shall determine what the rental for a vacancy shall be".

Before the Board could make a final decision establishing the rates of annual rent adjustments, it was required by subdivision (h) of section YY51-5.0 to hold one or more public hearings, for the purpose of collecting information relating to the designated factors, set forth in subdivision (b) of section YY51-5.0, quoted *supra,* which factors the Board was mandated by subdivision (b) to take into account. In substance, the language of subdivision (h) directed that the Board publish notice of the date, time, location, and summary of the subject matter for the public hearing or hearings, in the City Record, for a period of not less than eight days, and, at least once in a newspaper of general circulation, at least eight days, prior to each hearing date. Moreover, subdivision (h) specifically stated that the public hearing or hearings "shall be open for testimony from any individual, group, association or representative thereof who wants to testify".

Besides being required to hold a public hearing or hearings, when it met to conduct public business, the Board was subject to article 7 of the New York State Public Officers Law (note: this is the so-called Open Meetings Law). The Open Meetings Law requires, *inter alia,* that a public notice of the time and place of a meeting held by a public body, like the Board *(see,* Public Officers Law § 102 [2]), to conduct public business (Public Officers Law § 102 [1]) "shall be given to the news media" at least one week prior to the scheduled date (Public Officers Law § 104 [1]), and that the notice "shall be conspicuously posted in one or more designated public locations at least seventy-two hours before such meeting" (Public Officers Law § 104 [1], [2]). Our examination of the provisions of the Open Meetings Law indicates to us that the legislative intent is "to enable members of the public to 'listen to the deliberations and decisions that go into the making of public policy' (Public Officers Law § 100; *see also, Matter of Orange County Pub. v Council of City of Newburgh,* 60 AD2d 409, *affd* 45

NY2d 947)" *(Mitchell v Board of Educ.,* 113 AD2d 924-925 [1985]).

Our review of the record indicates that on June 27, 1980, after a series of public hearings, which were held pursuant to subdivision (h) of section YY51-5.0 of the Administrative Code, and the provisions of the Open Meetings Law, the Board issued three orders numbered 10d, 11a and 12. These three 1980 orders, in substance, concerned fuel surcharges, and the level of fair rent adjustments applicable to one-, two- and three-year leases, entered between July 1, 1980 and September 30, 1981 (note: previously, rent adjustment orders of the Board ran from July 1 of the year in which the Board issued the order until June 30 of the following year. However, Laws of 1980 [ch 235] provided that the July 1, 1980 rent order would remain in effect until September 30, 1981, and, that thereafter, the Board's annual orders would apply to leases commencing on October 1, or within the subsequent 12 months).

The other four contested orders, numbered 10e, 11b, 12a and 13, were issued by the Board on June 29 and 30, 1981, after it had held the series of public hearings, which, as mentioned *supra,* were required by subdivision (h) of section YY51-5.0 of the Administrative Code, and the provisions of the Open Meetings Law. Those four 1981 orders, in substance, concerned fuel adjustment surcharges, rent adjustments, vacancy increase allowances and electrical inclusion adjustments.

Four of the orders, numbered 10d and 11a of 1980, and numbered 10e and 11b of 1981, dealt solely with a fuel adjustment surcharge of $8 per month, in those instances where the landlord provided the tenant with heat.

Our analysis of these fuel surcharge allowance orders indicates: (a) the 1980 order numbered 10d, only authorized this allowance to be charged during the period from July 1, 1980 through June 30, 1981, and was only applicable to leases entered into between July 1, 1978 and June 30, 1979, (b) the 1981 order numbered 10e modified order numbered 10d to the extent of permitting the allowance to continue to be charged until the expiration of leases entered into between July 1, 1978 and June 30, 1979, (c) the 1980 order numbered 11a authorized that this allowance could be charged one year after commencement of the lease, and was only applicable to leases entered between July 1, 1979 to June 30, 1980, and, (d) the

1981 order numbered 11b continued the allowance permitted by order numbered 11a.

At this point, we turn to an analysis of the remaining three orders, numbered 12, 12a and 13.

The 1980 order numbered 12 concerned rental adjustments, vacancy increase allowances and an electrical inclusion adjustment. In substance, this order: (a) set the levels of fair rent adjustments for renewal leases, where the initial lease was entered into between July 1, 1980 and September 30, 1981, at 11%, 14% and 17%, for apartments in which heat was provided by the owner, and at 5%, 7% and 9%, for units in which the tenant provided the heat, for one-, two- and three-year leases, respectively; (b) established a two-tier vacancy increase allowance, applicable only to new leases entered into between July 1, 1980 and June 30, 1981, of 5% for apartments where there had been a change in tenancy since 1975, and 10% where there had been no change in tenancy since 1975; (c) permitted an electrical inclusion adjustment of 1.5%; and, (d) specifically reserved to the Board the right to further adjust the rates permitted on renewal leases in response to unforeseen changes in the fuel situation or other factors affecting the operation and maintenance cost index. Thereafter, while 1981 order numbered 12a permitted no fuel surcharges on existing leases entered into pursuant to order numbered 12, *supra,*it did impose a 15% vacancy allowance on new leases signed during the three-month period from July 1, 1981 to September 30, 1981.

Finally, 1981 order numbered 13 concerned rental adjustments, a vacancy increase allowance and an electrical inclusion adjustment. In substance, this order: (a) set the levels of fair rent adjustments for renewal leases, where the initial lease was entered into between October 1, 1981 and September 30, 1982, at 10%, 13% and 16%, for apartments in which heat was provided by the owner, and, at 6.5%, 9.5% and 12.5%, for units in which the tenant provided the heat, for one-, two- and three-year leases, respectively; (b) established a vacancy increase allowance, applicable only to new leases entered into between October 1, 1981 and September 30, 1982, of 15%; (c) permitted an electrical inclusion adjustment of 4%; and, (d) specifically reserved to the Board the right to make future adjustments on renewal leases to accommodate unforeseen and catastrophic economic changes.

An order or regulation, which is legislative in nature, issued

by an administrative body "will be upheld as valid if it has a rational basis, that is, if it is not unreasonable, arbitrary or capricious" *(Grossman v Baumgartner,* 17 NY2d 345, 349 [1966]; *see, Matter of Lakeland Water Dist. v Onondaga County Water Auth.,* 24 NY2d 400, 408 [1969]; *Matter of Hawley v Cuomo,* 46 NY2d 990, 991-992 [1979]).* We will apply, *infra,* this standard of review expressed in the legal authority, *supra,* to determine the validity of the contested orders herein.

By the service of a summons and complaint, dated October 23, 1980, the plaintiffs commenced the instant action against the Board.

Subsequently, Special Term (order, Supreme Court, New York County [George Bundy Smith, J.], entered June 7, 1984) denied plaintiffs' application for class certification, and the plaintiffs did not appeal from that order. Examination of Special Term's order indicates that, in substance, it was based upon a finding that "where governmental operations are involved, and where subsequent [parties] will be adequately protected under the principles of *stare decisis (Matter of Rivera v Trimarco,* 36 NY2d 747) * * * class action relief is not necessary" *(Matter of Jones v Berman,* 37 NY2d 42, 57 [1975]).

The plaintiffs amended their initial complaint several times, until they served their fifth amended complaint, dated July 8, 1983, which is the complaint before us, in the instant appeal.

In 48 separate causes of action, this complaint alleges that orders numbered 10d, 10e, 11a, 11b, 12, 12a and 13 were issued unlawfully, and in disregard of the applicable statutory standards, with the alleged result that tenants were paying, or had paid, higher rents than they would have paid, if the Board had acted lawfully. Specifically, plaintiffs alleged, in causes of action 1-3 and 22-25, that the Board violated the RSL; in causes of action 4-6 and 26-29, that the Board failed to establish procedures to receive, disseminate and analyze information in violation of the Open Meetings Law; that in the 10th cause of action the Board held meetings in violation of the Open Meetings Law; in causes of action 14-16 and 38-41, the Board did not fulfill the prehearing notice requirements of subdivision (h) of section YY51-5.0 of the Administrative Code; in causes of action 7-9 and 30-33, that the Board did not file its findings by July 1, as required by subdivision (b) of section YY51-5.0; in causes of action 11-13 and 34-37, that the Board was an unlawfully constituted body throughout 1980 and

1981; in causes of action 20-21 and 46-48, that the Board improperly issued additional orders; and, in causes of action 17-19 and 42-45, that the Board acted arbitrarily, capriciously and without a rational basis.

The plaintiffs, in substance, seek declaratory judgment relief, to the effect that the fuel surcharge orders be vacated and declared invalid, and, the lease renewal and vacancy increase allowance orders be vacated, declared invalid and remanded to the Board for further reconsideration.

In its answer, the Board, in substance, denied the complaint's material allegations, and asserted affirmative defenses, which included, *inter alia*, that the contested seven orders were not arbitrary, capricious, or affected by any error of law, since they were allegedly issued in compliance with the RSL and the Open Meetings Law.

By notice of motion, dated March 1, 1985, the defendant moved for summary judgment.

Special Term, *inter alia*, granted defendant Board partial summary judgment as to 29 (7-19 and 30-45) causes of action, granted plaintiffs partial summary judgment as to 5 (20-21 and 46-48) causes of action, and, denied summary judgment as to the remaining 14 (1-6 and 22-29) causes of action.

While we agreed with Special Term's granting of defendant Board's motion for summary judgment to the extent of 29 causes of action, we disagree with Special Term's denial of defendant Board's motion for summary judgment as to the remaining 19 causes of action.

We find that the defendant Board was entitled to summary judgment as to causes of action 20, 21, 46, 47 and 48, since the Board, in 1980 and 1981, possessed the legal authority *(Coalition Against Rent Increase Passalongs v Rent Guidelines Bd.,* 104 Misc 2d 101 [Sup Ct, NY County, Martin B. Stecher, J.], *affd* 76 AD2d 1043 [1st Dept 1980]) under the RSL to issue supplementary orders (10d, 10e, 11a, 11b and 12a) concerning fuel adjustment charges and vacancy increase allowances (note: these supplementary orders have also been referred to as "reopeners").

Our examination of the words "The * * * board shall establish annually guidelines for rent adjustments" contained in subdivision (b) of section YY51-5.0 of the Administrative Code indicates to us that those words were not intended to prohibit the Board from issuing supplementary orders or reopeners to protect the public from the impact of changed economic

conditions in the housing market, such as the fuel crisis caused by the manipulation of oil prices by OPEC. The Court of Appeals has ruled in *Matter of Sullivan County Harness Racing Assn. v Glasser* (30 NY2d 269, 277 [1972]), that "[t]he authorities are in agreement that upon a change in circumstances * * * or new information, an agency may reconsider and alter a prior determination". More recently, that court held in *Matter of City of New York v State of N. Y. Commn. on Cable Tel.* (47 NY2d 89, 92 [1979]), that "[a]n administrative agency, as a creature of the Legislature, is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication". Orders numbered 10d, 10e, 11a and 11b, as mentioned *supra,* deal solely with fuel adjustment surcharges.

The Board, in 1981, promulgated order numbered 12a, which, as mentioned *supra,* dealt with a vacancy increase allowance, in order to respond to Laws of 1980 (ch 235). The intent of chapter 235, as mentioned *supra,* was to initiate a system whereby the annual order issued by the Board in July would not go into effect until October 1 of the same year, so that tenants, prior to signing a renewal lease, would know what rent adjustments were permitted by the Board. As mentioned *supra,* 1980 order numbered 12, besides containing rent adjustments, also contained a two-tiered vacancy increase allowance for new leases. However, by the terms of order numbered 12 this vacancy allowance expired in 12 months, i.e., on June 30, 1981, which meant there would be no established vacancy rate for the last three months of the life of order numbered 12. In order to avoid this, the Board issued 1981 order numbered 12a, which amended order numbered 12 to the extent of setting a vacancy allowance for the period July 1, 1981 through September 30, 1981.

In passing, we note that the Omnibus Housing Act of 1983 (L 1983, ch 403) significantly changed subdivision (b) of section YY51-5.0 of the Administrative Code by deleting the word "annually" from the phrase "[t]he * * * board shall establish annually guidelines for rent adjustments", which appears in that section. Furthermore, this 1983 act added a new subdivision (i) to section YY51-5.0, which provides, in pertinent part, as follows: "Maximum rates of rent adjustment shall not be established more than once annually for any housing accommodation within the board's jurisdiction. *Once established, no such rate shall, within the one-year period, be adjusted by any surcharge, supplementary adjustment or other modification"*

(emphasis supplied). Nevertheless, this 1983 change in the Code has no effect herein, since the Board promulgated the orders in issue in 1980 and 1981, under the old Code provision, and the adoption of this new subdivision (i) is additional evidence that no such restriction existed prior to its adoption.

Further, our analysis of the record before us indicates that the Board was entitled to summary judgment as to the remaining 14 causes of action (1-6 and 22-29), as we find that the Board demonstrated an adequate and rational basis for its issuance of the seven contested orders *(see, Yonkers Community Dev. Agency v Morris,* 37 NY2d 478, 486 [1975], *appeal dismissed* 423 US 1010 [1975]), since the Board considered all of the statutory factors enumerated in subdivision (b) of section YY51-5.0, which factors were set forth *supra,* and held the required public hearings.

When an agency, such as the Board, is engaged in making a quasi-legislative determination, it "is not confined to factual data alone but also may apply broader judgmental considerations based upon the expertise * * * [of the Board]" *(Matter of Catholic Med. Center v Department of Health,* 48 NY2d 967, 968-969 [1979]).

Since all of the Board's findings and explanatory statements concerning each one of the subject orders was in the voluminous record before the court, as were complete transcripts of the relevant hearings and public meetings, as well as copies of numerous reports, memoranda and other written materials considered by the Board prior to issuing the orders, and, in view of the fact that there is no dispute between the parties concerning the data before the Board, summary judgment is appropriate. The primary issue between the parties pertains to the methodology employed by the Board in analyzing this data, which is a question of law rather than a question of fact *(see, Matter of Asia Socy. v Tax Commn.,* 92 AD2d 781, 782 [1st Dept 1983]).

In conclusion, we grant the defendant Board's motion in respect to causes of action 1-6 and 22-29, since the Board presents an "adequate basis" for its determinations, and the plaintiffs cannot indicate, with merit, that the Board's determination was "without foundation" *(Yonkers Community Dev. Agency v Morris, supra,* at 486).

Accordingly, the order and judgment (one paper), Supreme Court, New York County (Bruce McM. Wright, J.), entered February 3, 1986, which, *inter alia,* (1) granted defendant

Board's motion for summary judgment only as to causes of action 7-19 and 30-45, and otherwise denied it, and (2) granted plaintiffs' partial summary judgment as to causes of action 20-21 and 46-48, is unanimously reversed, to the extent appealed from, and as limited by the briefs, on the law and on the facts, and defendant Board's motion for summary judgment is granted as to the remaining causes of action 1-6, 20-29 and 46-48, and the complaint is dismissed, without costs.

SULLIVAN, J. P., ASCH, MILONAS and SMITH, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on or about February 3, 1986, unanimously reversed, to the extent appealed from, and as limited by the briefs, on the law and on the facts, and defendant Board's motion for summary judgment is granted as to the remaining causes of action 1-6, 20-29 and 46-48, and the complaint is dismissed, without costs and without disbursements.